**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Maria Dalomba</u>

    **v.**                                             Civil No. 15-cv-272-PB
                                                Opinion No. 2016 DNH 071
<u>Edwin Simonsen, et al.</u>


<u>**MEMORANDUM AND ORDER**</u>

Maria Dalomba and her family, who are African-American,
camped for several seasons at Hidden Valley RV Park in Derry,
NH.  During their time at Hidden Valley, the family experienced
a series of racially-charged taunts and threats, largely from
another camper and a park "security guard."  When Dalomba
brought these incidents to the attention of defendants Edwin
Simonsen and Catherine Kierstead, the park's managers, they
responded with their own provocative comments and what Dalomba
perceived as a threat to throw them out of the park.

Dalomba now brings suit against Simonsen, Kierstead, and
Hidden Valley under 42 U.S.C. § 1981, arguing that the
defendants interfered, on account of Dalomba's race, with her
contractual right to stay at the park.  The defendants move to
dismiss pursuant to Rule 12(b)(6).  They claim, among other
things, that the entire action is barred by the applicable
statute of limitations, and that Dalomba failed to allege

sufficient facts to show that Simonsen and Kierstead individually took any racially-motivated action against her. For the reasons that follow, I grant the defendants' motion in part and deny it in part.

## I.   BACKGROUND[1]

Maria Dalomba, her partner Larry Barrows, and their five children are "Black persons of African heritage."  Doc. No. 1 at 3.  For the summer and early fall each year from 2007 to 2011, the family rented a space at the Hidden Valley RV Park in Derry, NH and camped there together under a seasonal contract.  During the years they camped at Hidden Valley, Dalomba and her family were the only campers of African heritage at the park.  Id.

From 2008 to 2011, a camper named Sean Piper, a Caucasian, rented the site adjacent to Dalomba.  Sometime during the summer of 2008, Dalomba's oldest child, Troy, was walking with a group of friends when Piper called over to Troy and yelled the word "mongrel."  Id. at 4.  Piper also told a girl who had been walking with Troy to "watch out or you will have mongrel

---

[1] The facts are drawn primarily from Dalomba's complaint (Doc. No. 1) and are construed in the light most favorable to Dalomba. See Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009).

babies." Id.  Another camper who witnessed the incident
mentioned it to Dalomba, who reported it to the then-campground
manager Stephanie Simonsen, the now-deceased wife of defendant
Edwin Simonsen.  Stephanie Simonsen apologized to Dalomba and
promised to speak with Piper about the incident, although no one
associated with Hidden Valley followed up with Dalomba or took
corrective action.  Id. at 5.  Dalomba and her family were very
upset by the incident and Troy left the campground, returning
"only rarely" after the encounter.  Id. at 4.

In addition to the "mongrel" incident, Piper continued to
give Dalomba and her family a difficult time.  Later that summer
of 2008, Piper complained to a park security guard identified in
Dalomba's complaint as "Francis"[2] about music that Dalomba and
her family were playing, even though the music was not playing
loudly.  Id. at 6.  Francis came over to Dalomba's campsite and
demanded that Dalomba turn down the radio, even though "quiet
time" had not begun at the park.  Id.  In addition, Francis came
over on several occasions and demanded that the family put out
their campfire early, before 9:00 p.m., despite the campground

---

[2] The complaint does not disclose the security guard's full name.
See generally Doc. No. 1 at 6-18.  It notes only that "Francis"
was a "camper-security guard employee of Hidden Valley."  Id. at
8.

rule allowing fires until 10:30 or 11:00 p.m.  Id.  Francis also followed Barrows, Dalomba's partner, around the golf course when Barrows played golf.  Francis did not follow white golfers around the golf course in the same manner.  Id.

During the 2009 and 2010 camping seasons, Piper continued to harass Dalomba and her family.  On multiple occasions, when they were cooking on their grill, Piper yelled over: "what are we having, fried chicken and watermelon?" followed by a burst of laughter.  Id. at 7.  Similarly, when Dalomba and her children entered the campground lake to swim, Piper yelled to his son to "[c]ome out of the water, because you don't want to catch anything."  Id.  To avoid these encounters, Dalomba took her kids to a smaller and less desirable pond to swim.  Id.

The summer of 2011 brought more racially-charged incidents. On June 26, 2011, Francis called out "nigger campers!" in the direction of Dalomba's campsite during a conversation with other campers.  Id. at 8.  The following day, a "new security guard," who the complaint identifies as "Jeremy/James"[3] Kierstead, came by Dalomba's campsite and told Dalomba and Barrows that he had

---

[3] The complaint does not indicate why this individual is referred to as "Jeremy/James," but it notes that he was the son of defendant Catherine Kierstead and the grandson of defendant Edwin Simonsen.  Doc. No. 1 at 8.

"heard about what happened last night."  Id.  Jeremy/James said that he was surprised that Barrows had not physically assaulted Francis for his comment about "nigger campers."  Id.  Dalomba and Barrows responded by explaining to Jeremy/James their history of racial harassment from Piper, including the comments about "mongrels," fried chicken, and watermelon.  Id. at 8-9. They noted that they felt intimidated when they left their trailer and that Piper was also harassing them about the location of their flower bed.  Id. at 9.

In response, Jeremy/James assured Dalomba that his mother, defendant Kierstead, and his grandfather, defendant Simonsen, were aware of Piper's harassment and would "take action."  Id. Barrows also reported the incident directly to Simonsen and Kierstead during a conversation about why Barrows and family did not attend camp dances.  Barrows responded that he did not want to hear comments about watermelon and preferred to stay home. Id. at 9-10.

Another confrontation occurred about a week later, on July 2, 2011.  Elijah, Dalomba's son, was riding his bike on a narrow path when Piper drove up to him in a golf cart, nearly forced him off the path, and told Elijah to "move it monkey!"  Id. at 10.  Piper then sped away.  Elijah returned home upset and

explained to Dalomba what had happened.  Later, in response,
Barrows went over to Piper's trailer and told him "if you ever
touch my kid I will break your _____ neck!"[4]  Id.  Simonsen
then arrived on the scene and witnessed a neighbor of Piper's
named Wayne (Wally) McFarland threaten Barrows, saying "[i]f you
people want trouble, we'll bring it;" "[y]ou'd better move or
you're going to have problems;" and "I have people I can call.
Don't make me make the call!"  Id. at 11.  Piper's girlfriend
Lisa Carson was also on the scene, and made an obscene gesture
at Dalomba, who was nearby.  Id.  Dalomba responded by swearing
at Carson.  Id.

After Dalomba responded to Carson's gesture, Simonsen
intervened and yelled at Dalomba to "Calm down because when you
people get upset you start shooting."  Id.  The following
exchange ensued:

> Dalomba: "Are you kidding me?"
> Simonsen: "Calm down, young lady!"
> Dalomba: "Don't you see that we're being threatened?"
> Simonsen: "No, I don't, and if you don't calm down, you'll
> be thrown out."
> Dalomba: "We can't calm down, he's a racist and called our
> son a monkey."
> Simonsen: "I don't know about that, but you need to calm
> down."

---

[4] I quote verbatim from the complaint, which includes "_____,"
presumably shorthand for an expletive.

Id.  Simonsen did not tell the other campers to calm down,
despite their repeated comments and threats.

A week later, on July 9, 2011, Dalomba and her family
discovered a large, inflated plastic monkey hanging from its
neck from a tree located within the campsite of Francis, the
security guard.  Id. at 12-13.  As Dalomba and Barrows gathered
their children into the trailer and prepared to confront
Simonsen and Kierstead about the monkey, another security guard
named John Dusombre approached them in a golf cart and ordered
Dalomba to move her garden.  Id. at 13.  Dalomba announced that
she was going to the campground office.

When Dalomba arrived at the office, no one was there, so
she knocked on the door of the campground residence.  Kierstead
came to the door and Dalomba asked her if she had seen the
monkey hanging from the tree.  Instead of responding about the
monkey, Kierstead pointed a finger in Dalomba's face and asked
her if Dalomba was going to move her garden.  Id.  Dalomba
stated that she was there to talk about the monkey, not a
garden, and demanded to know whether Kierstead was going to take
down the monkey.  Id. at 14.  Kierstead responded that she would
not take down the monkey, and said that "the monkey was for the
children's entertainment."  Id.  Dalomba replied, "Are you

serious?  If you think that the monkey is for entertainment, you are a racist _____." Id.  In response, Kierstead pointed at Dalomba's face again.  Dalomba told her to remove her finger but Kierstead yelled "I can point my fingers at your face because I can." Id.  Then Kierstead said, "If you don't move your garden today, you'll be out of here." Id.  Dalomba replied that she would move the garden when Kierstead took the monkey down, and requested that Kierstead "please stop pretending that this wasn't a race issue about the monkey." Id.  Kierstead responded, "You guys are fighting about flower beds." Id.

Dalomba insisted that her issue was the monkey hanging from a tree, not flower beds.  Finally, Kierstead "promis[ed] that she would have her father throw them out." Id. at 15.  Dalomba responded that they would leave, and requested that Kierstead write her a check for the prorated amount for leaving early. Kierstead indicated that that would not be a problem but that Dalomba and her family would have to clean the site before they left. Id.  Dalomba agreed, and continued to emphasize that the issue they had was racism and the monkey, while Kierstead insisted it was the flower bed.

Dalomba returned to her family and informed them that they had been kicked out of the campground because "we are Black and

we spoke up." Id. at 15.  They then cleaned their campsite with the help of other neighbors.  Jeremy/James, the security guard, came by once they were finished and remarked at how clean the site looked.  Id. at 16.  Barrows received a refund check that appeared to cover the entire month of July, which was more than they were entitled to, so he went to speak with Kierstead.  Id. Kierstead said that she was giving him a refund for the entire month because "I just want you out of here."  Id.  The family departed that day, although they left the trailer behind because they needed a few extra days to contact a trailer moving company.  Id.

At some point soon after Dalomba and family had left Hidden Valley, Jeremy/James removed the lug nuts from Dalomba's trailer despite Barrows asking him not to.  Id. at 17.  Jeremy/James claimed that he had removed the lug nuts to help inflate the trailer's tires.  Id.  This impeded Barrows's ability to remove the trailer from Hidden Valley.  Id.

Six days after Dalomba and her family left Hidden Valley, on July 15, 2011, Dalomba discovered that the refund check issued them by Kierstead had a "stop payment" on it and was subject to a $35 fee by the bank.  Id.  Barrows called Kierstead, who informed him that she had placed the "stop

payment" on the check because their campsite was not clean.  Id.
Barrows responded that he had pictures of their site, and it was
clean.  Id.  Eventually, a new check was issued without the
"stop payment" notification.  Id.

    The next month, on August 26, 2011, Dalomba filed a charge
of discrimination with the New Hampshire Commission for Human
Rights.  Id. at 18.  A copy of the document was sent to Hidden
Valley.  A week later, on September 2, 2011, Jeremy/James called
Dalomba and stated that Dalomba's "suing" would "get nowhere"
since "we donate so much money to the State of New Hampshire."
Id.

    Nearly four years after these events, on July 11, 2015,
Dalomba brought suit in this court against Simonsen, Kierstead,
and Hidden Valley, for alleged violations of 42 U.S.C. § 1981.
The defendants filed a motion to dismiss under Rule 12(b)(6).


## II.  **STANDARD OF REVIEW**

    To survive a Rule 12(b)(6) motion, a plaintiff must allege
sufficient facts to "state a claim to relief that is plausible
on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).
A claim is facially plausible if it provides "factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," id., but "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of wrongdoing. Twombly, 550 U.S. at 556.

I employ a two-step approach in deciding a Rule 12(b)(6) motion. See Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011). First, I screen the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." Id. (citations, internal punctuation, and alterations omitted). I then accept as true all non-conclusory factual allegations and the reasonable inferences drawn from them, and determine whether the claim is plausible. Id.

In an appropriate case, an affirmative defense, including the statute of limitations, may be adjudicated on a Rule 12(b)(6) motion to dismiss. See In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 16 (1st Cir. 2003). An appropriate case is one in which two conditions are met. See id. First, "the facts that establish the defense must be definitively ascertainable from the allegations of the complaint . . . ." Id.; Blackstone

Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001).  Second,
"the facts so gleaned must conclusively establish the
affirmative defense."  In re Colonial Mortg., 324 F.3d at 16;
see also Edes v. Verizon Commc'ns, Inc., 417 F.3d 133, 137 (1st
Cir. 2005) ("Granting a motion to dismiss based on a limitations
defense is entirely appropriate when the pleader's allegations
leave no doubt that an asserted claim is time-barred.") (quoting
LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st
Cir. 1998)).


### III.  ANALYSIS

Dalomba brings suit under 42 U.S.C. § 1981, a
Reconstruction-era federal statute that prohibits racial
discrimination in the "mak[ing] and enforc[ing]" of contracts.
42 U.S.C. § 1981(a).  Section 1981 claims are often, though not
exclusively, brought in the employment context, since disputes
over discriminatory hiring and firing generally implicate
employment contracts.  See Young v. Int'l Tel. & Tel. Co., 438
F.2d 757, 760 (3d Cir. 1971) ("In the context of the
Reconstruction it would be hard to imagine to what contract
right [besides employment] the Congress was more likely to have
been referring.").  Over time, section 1981 jurisprudence has

thus been influenced by case law interpreting Title VII of the
Civil Rights Act of 1964, see 42 U.S.C. § 2000e, although
meaningful differences exist between the statutes.  See CBOCS
W., Inc. v. Humphries, 553 U.S. 442, 455 (2008) (noting that
"the remedies available under Title VII and under § 1981,
although related, and although directed to most of the same
ends, are separate, distinct, and independent.") (quoting
Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 461
(1975)); Smith v. Bray, 681 F.3d 888, 896 (7th Cir. 2012) ("The
substantive standards and methods of proof that apply to claims
of racial discrimination and retaliation under Title VII also
apply to claims under § 1981."); Madison v. IBP, Inc., 330 F.3d
1051, 1060-61 (8th Cir. 2003) (Applying "similar standards . . .
under both Title VII and § 1981" and noting that the "two
statutes have substantially identical legal theories of
recovery") (internal alterations and quotations omitted).

     Like Title VII claims, § 1981 claims are generally brought
under one of three distinct theories: (1) purposeful
discrimination; (2) a hostile work environment based on racial
harassment; or (3) retaliation.  Each cause of action carries
its own elements and body of supporting case law.  To state a
claim for purposeful discrimination under § 1981, a plaintiff

must show: (1) that she is a member of a racial minority, (2) that the defendants possessed an intent to discriminate on the basis of race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute. King v. Friends of Kelly Ayotte, 860 F. Supp. 2d 118, 127-28 (D.N.H. 2012) (citing Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam)).  To state a viable racial harassment claim under § 1981, the plaintiff must establish that she is a member of a racial minority and that the defendant intentionally interfered with her ability to make or enforce a contract by engaging in severe or pervasive racial harassment of the plaintiff.  See generally Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002) (discussing racial harassment claims under § 1981 in the employment context).[5]

---

[5] Although this case arises outside the employment context – Dalomba was essentially a lessee, not a Hidden Valley employee – the legal rationale underpinning § 1981 hostile work environment claims applies with equal force here.  Section 1981 prohibits racial discrimination in the making and enforcing of contracts. 42 U.S.C. § 1981(a).  Although employment contracts are the most common form of contractual relationship at issue in § 1981 cases, the statute "does not limit itself, or even refer, to employment contracts but embraces *all contracts*." Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 14 (1st Cir. 1999) (emphasis added).  Additionally, courts have recognized, at least in the employment context, that the creation or tolerance of a racially hostile environment may constitute impairment of a contractual relationship sufficient to allow a claim under § 1981. See PowerComm, LLC v. Holyoke Gas & Elec. Dep't, 657 F.3d

Finally, to state a claim for retaliation in the context of the present case, the plaintiff must show that she complained to the defendant of racial discrimination or harassment, that the defendant interfered with her ability to make or enforce a contract, and that her complaint and the defendant's interference are causally connected.  See generally Humphries, 553 U.S. at 455 (holding that § 1981 applies to claims of retaliation); Pina v. Children's Place, 740 F.3d 785, 800-01 (1st Cir. 2014) (describing a § 1981 retaliation claim in the employment context); Ellis v. Houston, 742 F.3d 307, 319 (8th Cir. 2014) (same).

Here, Dalomba's complaint is broken into two counts, both under § 1981:  Count I alleges "discriminatory harassment" and Count II alleges "retaliation."  Doc. No. 1 at 18-24.  Dalomba bases both counts on substantially the same evidence and the

---

31, 37 (1st Cir. 2011) ("[i]t is common ground that hostile work environment claims, charging violation of § 1981 or Title VII, can be based on racial bias"); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987) ("[t]he cause of action for a hostile working environment has also been recognized under § 1981").  Thus, a hostile environment that impairs a contractual relationship in the employment context may conceivably impair a contractual relationship outside that context as well.  See, e.g., Danco, 178 F.3d at 14 ("One could say that avoiding a hostile work environment is an implicit contractual benefit or term . . . .").

parties do not differentiate between the counts in their briefs.[6]

In response to Dalomba's claims, the defendants present two primary arguments.  First, they contend that the suit is barred by the four-year statute of limitations that applies to defendants' claims.  Second, they argue that neither Simonsen nor Kierstead displayed the racial animus necessary to state a claim under § 1981.[7]  I consider each argument in turn.

## A.   **Statute of Limitations**

Section 1981 claims are subject to the four-year federal

---

[6] In addition, neither party discusses whether Count I should be construed as a purposeful discrimination claim or a harassment claim.  Construing the count generously in favor of the plaintiff, however, I understand her to assert a hostile environment racial harassment claim.

[7] The defendants also argue, relying largely on cases analyzing Title VII claims, that § 1981 does not allow claims for individual liability.  See doc. no. 20-1 at 5-9.  This argument is unpersuasive.  Although the First Circuit has not explicitly addressed the issue, at least five circuits have held that § 1981 permits claims for individual liability.  See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74-75 (2d Cir. 2000); Allen v. Denver Pub. Sch. Bd., 928 F.2d 978, 983 (10th Cir. 1991); Jones v. Cont'l Corp., 789 F.2d 1225, 1231 (6th Cir. 1986); Taylor v. Jones, 653 F.2d 1193, 1200 (8th Cir. 1981); Faraca v. Clements, 506 F.2d 956, 959 (5th Cir. 1975).  The defendants seek to overcome this persuasive authority by citing cases holding that Title VII discrimination claims do not encompass individual liability.  See, e.g., Gascard v. Franklin Pierce Univ., 2015 DNH 049, 18-19.  More would be required, however, to persuade me to disregard the carefully-considered decisions of the other circuit courts that have construed § 1981 differently.

"catchall" statute of limitations set forth in 28 U.S.C. § 1658.
See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83
(2004).  Dalomba filed this action on July 11, 2015.  Most of
the alleged discriminatory incidents, including Dalomba's
departure from Hidden Valley, occurred before July 11, 2011 –
outside the four year period.  The parties agree that only three
relevant actions took place after July 11, 2011: (1)
Jeremy/James Kierstead removed the lug nuts from Barrows'
trailer; (2) Catherine Kierstead placed a "stop payment" on the
refund check; and (3) Jeremy/James called Dalomba to state that
her lawsuit would "get nowhere."  See doc. nos. 23 at 1-2; 26 at
1-2 (noting that the parties appear to agree that only these
three incidents fell within the four year period).

    Defendants argue that the statute of limitations bars
Dalomba from basing her claims on any actions that occurred
prior to July 11, 2011.  Moreover, they claim, the three
remaining timely acts are not themselves discriminatory, and
therefore Dalomba fails to state a viable § 1981 claim.  Dalomba
counters that the defendants' actions must be viewed as a
"continuum of racial harassment" that developed over time and
created a racially hostile environment at the camp.  She invokes
the "continuing violations" doctrine, arguing that as long as

17

one discriminatory act is timely, the court may consider all related acts as part of a pattern of repeated conduct.

To analyze these claims, I apply National Railroad Passenger Corp. v. Morgan, which provides the current framework of the "continuing violations" doctrine.[8] 536 U.S. 101, 110, 114-15 (2002).  To determine when events are barred by the statute of limitations, Morgan distinguishes between "discrete acts of discrimination or retaliation" and hostile environment claims.  Id. at 110-21.  On the one hand, in claims involving a "discrete retaliatory or discriminatory act," Morgan holds that a party must file a claim within the applicable limitations period or lose the ability to recover for it.  See id. at 111. On the other hand, claims alleging a hostile environment need only involve "a single act of discrimination or harassment"

---

[8] Morgan considered a racial discrimination claim brought under Title VII, not § 1981, but as the parties have discussed, Title VII closely resembles § 1981 and generally applies the same analytical framework.  See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18 (1st Cir. 1999) (noting that claims under section 1981 and Title VII hinge upon "identical legal standards").  As a result, although Morgan's "continuing violations" doctrine is most often employed in Title VII cases, it applies with equal force to claims based on § 1981.  See, e.g., Tademy v. United Pac. Corp., 614 F.3d 1132, 1154 (10th Cir. 2008) (noting that "the Seventh, Eighth, and Eleventh Circuits have all concluded that Morgan's analysis of the Title VII statute of limitations for hostile environment claims should be applied to § 1981 claims").

within the statutory filing period to satisfy the statute of limitations.  Id. at 115.  This is because "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct."  Id.; Madison, 330 F.3d at 1056.  Thus, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."[9]  Morgan, 536 U.S. at 117.

This distinction proves important here because Count I of Dalomba's complaint alleges an ongoing pattern of racial harassment that continued into the limitations period, whereas Count II alleges retaliation based on discrete acts, most of which occurred more than four years before Dalomba filed her complaint.  Accordingly, when considering the sufficiency of Count I, if Dalomba alleges that "a single act of discrimination

---

[9] The First Circuit traditionally applied the continuing violations doctrine by distinguishing between "serial" and "systemic" violations, with a separate analysis for each category.  See Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st Cir. 1998).  Morgan analyzes the issue by using different terminology.  See 536 U.S. at 110, 114-15.  Thus, it is no longer necessary to determine whether the continuing violation doctrine applies by considering whether a violation is serial or systemic.  Crowley, 303 F.3d at 406 ("Morgan supplants our jurisprudence on the continuing violation doctrine in hostile work environment claims, making it no longer necessary to distinguish between systemic and serial violations").

or harassment" occurred within the filing period, I must
consider "the entire time period of the hostile environment."
Id. at 115, 117.  As stated above, three acts of alleged
harassment indisputably fell within the filing period: the lug
nut removal, the stop payment order, and the threatening phone
call.  Dalomba argues that each of these acts constituted
harassment because they continued a pattern of racially-
motivated unfair treatment.  For the purposes of this motion,
where I draw all reasonable inferences in Dalomba's favor, I
agree.  All of the events before and after July 11, 2011 may
therefore be considered when evaluating Dalomba's hostile
environment claim.

Dalomba's retaliation claim is different.  According to
Dalomba, Simonsen and Kierstead retaliated against her for
complaining about the racist comments Dalomba and her family
endured.  Dalomba identifies a number of actions that allegedly
constituted "retaliation:" her constructive eviction from the
campground; the defendants' refusal to address any of the racist
comments from third parties like Piper; the removal of the lug
nuts; the stop payment order; and Jeremy/James's intimidating

phone call.[10]  Her complaint does not highlight any one of these acts as a "discrete act" of retaliation, but appears to view all these incidents as one broad continuum of racially-motivated "retaliation."

Morgan, however, clearly distinguishes between retaliation claims involving discrete acts and hostile environment claims involving patterns of discriminatory conduct.  See 536 U.S. at 110-121.  Following that guidance here, I must view each of the defendants' alleged acts of retaliation as separate, discrete acts.  It therefore becomes clear that acts before July 11, 2011, including the constructive termination of Dalomba's lease, are time-barred and may not be considered for Dalomba's retaliation claim.  See id. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").  Acts after July 11, 2011, however, may serve as a basis for a retaliation claim because they fell within the filing period.  Dalomba's

---

[10] Dalomba's complaint makes it somewhat difficult to discern which events allegedly constituted "retaliation," and which were mere contributors to a racially-hostile environment.  See Doc. No. 1 at 20-23.  She does not, for example, point solely to the constructive discharge as an example of retaliation.  As a result, I consider all the possible events that she recites as potential discrete acts of retaliation.

retaliation claim may therefore proceed solely on the basis of the three timely acts: the lug nut removal, the stop payment order, and the phone call.[11]

## B.   Discriminatory Intent

The defendants next contend that Dalomba fails to show that Simonsen and Kierstead individually possessed the discriminatory intent necessary to state a claim under § 1981.

Generally, "[a] claim under section 1981 requires proof of intentional or purposeful discrimination." Erebia v. Chrysler Plastic Prods. Corp., 772 F.2d 1250, 1257 (6th Cir. 1985) (citing Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982)).  "Conclusory allegations of generalized racial bias do not establish discriminatory intent." King, 860 F. Supp. 2d at 127-28 (quoting Flagg v. Control Data, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992)).  Moreover, "[a] claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement;" there must be "some affirmative link to causally connect the actor with the discriminatory action."  See Whidbee, 223 F.3d at 75 (quoting Allen v. Denver

---

[11] To the extent that Dalomba intends Count I to assert a claim for discrimination that is distinct from her hostile environment claim, the statute of limitations affects that claim in the same way that it affects her retaliation claim in Count II.

Pub. Sch. Bd., 928 F.2d 978, 983 (10th Cir. 1991)).  I bear in mind, however, that "[t]he element of intent required in section 1981 . . . can be proved circumstantially." Erebia, 772 F.2d at 1258.  Indeed, "it is the exceptional case where there is clear, direct evidence of racial animus . . . in the typical case, the discriminatory racial purpose must be divined from inferences and implications arising out of circumstantial evidence." Little v. United States, 489 F. Supp. 1012, 1024 (C.D. Ill. 1980).

To survive this motion, Dalomba's complaint must allege that Simonsen and Kierstead harbored racial animus towards Dalomba and her family.  Dalomba must further show that Simonsen and Kierstead were personally involved in racially-motivated discrimination; passive racial bias unconnected to discriminatory action will not suffice.  See Whidbee, 223 F.3d at 75.  For the purposes of determining discriminatory intent, I do not distinguish between timely and time-barred acts, and am permitted to examine all the conduct alleged in the complaint. See Morgan, 536 U.S. at 113 (noting that an employee may use time-barred discriminatory acts "as background evidence in support of a timely claim"); Tobin v. Liberty Mut. Ins. Co., 553

F.3d 121, 142 (1st Cir. 2009).[12]

### 1.  Simonsen

According to the complaint, during the first several years of Dalomba's stay at Hidden Valley, Simonsen was not directly involved in any racially-charged incidents.  Although he was allegedly made aware of Piper and others' comments, see doc. no. 1 at 9, he apparently took no action himself.  On July 2, 2011, however, Simonsen became directly involved in a confrontation between Dalomba and Barrows on one side, and Piper, Wayne McFarland, and Lisa Carson on the other.  The dispute arose after Piper allegedly called Dalomba's son a "monkey" and tried to force him off the road with a golf cart.  Id. at 10-11. During that confrontation, Simonsen reportedly yelled at Dalomba to "calm down because when you people get upset you start shooting."  Id. at 11.  Dalomba protested that she and her family were being threatened by Piper, who was "racist" and had called her son a "monkey."  Id.  Yet rather than question Piper

---

[12] Much of the racial harassment that Dalomba allegedly endured was inflicted on her by other tenants at the trailer park.  The question as to whether a landlord such as Hidden Valley may be held liable on a harassment theory for failing to prevent harassment by other tenants is an issue that the parties have not briefed and that I need not address to resolve the present motion.

about his conduct, Simonsen allegedly told Dalomba to calm down
or "you'll be thrown out [of the park]." Id.  Simonsen did not
tell the other campers to calm down or threaten to have them
removed, even though these campers were allegedly hurling
threats and insults.  Id.

In the broader context of this case, Simonsen's actions
could reasonably be interpreted to show racial animus towards
Dalomba and her family.  Simonsen allegedly knew that Dalomba
and her family had received racial taunts; a week prior to the
July 2 confrontation, Jeremy/James Kierstead, Simonsen's
grandson, "assured" Dalomba that Simonsen "[was] aware" of
Piper's harassment.  Id. at 9.  Even if not, however, he became
aware of the racialized nature of Dalomba's and Piper's dispute
when he arrived at the scene and heard from Dalomba that Piper
was "racist" and "called our son a monkey."  Id. at 11.  Faced
with these comments, Simonsen responded by stating that "when
you people" – presumably meaning Dalomba and her family, the
only African-Americans present – "get upset you start shooting."
Id.  A jury could reasonably infer that this comment was racial
in nature.  Moreover, when Dalomba protested that Piper was the
one threatening them, Simonsen responded by threatening to throw
Dalomba out of the park – but took no action against Piper, who

was white and reportedly instigated the conflict.

Viewed in isolation, these facts alone might not be sufficient to demonstrate that Simonsen intended to discriminate against Dalomba on the basis of race.  Yet viewed in context – Dalomba's family were the only African-Americans at the park; they had complained of racist treatment in the past; the present dispute was explicitly racial in nature – Simonsen's actions could plausibly reflect racial animus.  Moreover, Simonsen's "you people" comment and his threat to remove Dalomba provide the necessary "affirmative link to causally connect" Simonsen "with the discriminatory action."  See Whidbee, 223 F.3d at 75. As such, Dalomba has plead sufficient facts to state a claim against Simonsen.

   2.   Kierstead

Dalomba makes a similar case against Kierstead.  Again, Dalomba does not allege that Kierstead took any personally discriminatory actions during the first few years Dalomba camped at Hidden Valley.  Like Simonsen, however, Kierstead allegedly knew that Dalomba and her family had been the target of racial epithets.  Doc. No. 1 at 9.  Then, on July 9, 2011, Dalomba confronted Kierstead with what could be interpreted as a racial threat: an inflatable monkey hanging from a tree.  Id. at 13.

Dalomba demanded to know what Kierstead would do about the monkey, and told Kierstead that she interpreted the monkey as a racist gesture.  Id.  In response, Kierstead pointed her finger in Dalomba's face and told her that the "monkey was for the children's entertainment."  Id. at 14.  When Dalomba replied that she believed the monkey was a racist symbol, Kierstead allegedly pointed her finger at Dalomba again and threatened to throw her out of the park if she did not move her garden.  Id. Dalomba asked Kierstead to "stop pretending this wasn't a race issue," but Kierstead insisted that Dalomba was "fighting about flower beds," despite circumstantial evidence to the contrary. Id.

Later, after Dalomba agreed to leave the park, Kierstead gave her a prorated check that was apparently too much, and when asked, Kierstead stated that "I just want you out of here."  Id. at 16.  Then, after Dalomba and her family had left, Kierstead allegedly placed a "stop payment" on the refund check and told Dalomba it was because her campsite had not been cleaned, when it was in fact clean.  Id. at 17.

Taken in context, Kierstead's actions, like Simonsen's, allow a reasonable inference that Kierstead herself acted with racial animus.  Dalomba confronted Kierstead with a monkey

hanging from a tree – a symbol that Dalomba interpreted as a threat to violence.  Yet, Kierstead denied the racial implications of the monkey and instead threatened to throw Dalomba out of Hidden Valley.  Kierstead later stated that "[she] just want[ed] [Dalomba] out of here," which could indicate that her actions were motivated by personal hostility. Id. at 16.  Drawing all reasonable inferences in Dalomba's favor, as I must, the complaint states a plausible claim that Kierstead intended to discriminate and took sufficient direct action against Dalomba to causally connect her to the alleged discrimination.  As such, Dalomba has plead sufficient facts to state a claim against Kierstead.

## IV.   CONCLUSION

For the reasons stated above, the motion to dismiss (doc. no. 20) is granted in part and denied in part.  As to Dalomba's Count I, I deny the defendant's motion to dismiss and hold that the parties may consider all the events that allegedly contributed to the hostile environment in litigating this claim. As to Dalomba's Count II, I deny the defendant's motion to dismiss but rule that only the events following July 11, 2011 may be considered.  All three defendants – Simonsen, Kierstead,

and Hidden Valley LLC – remain in the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

March 30, 2016

cc:   Nancy Richards-Stower, Esq.
      Jeremy Eggleton, Esq.